IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED

MAY 3 1 2013

David J. Bradley, Clerk of Court

| | |
|---|---|
| The STATE OF TEXAS, and<br>The STATE OF LOUISIANA,<br>    *Petitioners*,<br><br>v.<br><br>ROY E. CRABTREE, in his official<br>capacity as the Regional Administrator<br>of the National Marine Fisheries Service,<br>ALAN D. RISENHOOVER, in his<br>official capacity as the National Marine<br>Fisheries Service Director of the Office<br>of Sustainable  Fisheries,<br>REBECCA M. BLANK, in her official<br>capacity as acting United States<br>Secretary of Commerce,<br>The NATIONAL OCEANIC AND<br>ATMOSPHERIC ADMINISTRATION,<br>The UNITED STATES DEPARTMENT<br>OF COMMERCE, and<br>The NATIONAL MARINE<br>FISHERIES SERVICE,<br>    *Respondents*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§   Case No. 1:13-cv-70 |

MEMORANDUM OPINION AND ORDER

At issue is whether an Emergency Rule promulgated by the Secretary of Commerce

shortening the red snapper fishing season in federal waters off the coasts of certain Gulf states

was unlawful under the Magnuson-Stevens Act.  The Secretary promulgated the Rule following

the recommendation of the Gulf Council of the National Marine Fisheries Service ("NMFS"), a

special council created by the Magnuson-Stevens Act tasked with conservation and management of certain fisheries in the Gulf of Mexico. Certain NMFS directives outline three criteria to judge when an emergency exists for purposes of the Magnuson-Stevens Act, criteria which Petitioners in this case argue have not been met. Petitioners also argue the Emergency Rule violates certain other provisions of the Magnuson-Stevens Act, and the regulations implementing this Act, sometimes called National Directives, which prohibit any rule, regulation, or action from discriminating between residents of different states. This Court finds that the Emergency Rule was unlawfully promulgated under the Magnuson-Stevens Act and the criteria in place because there was no emergency as defined by NMFS directives, and because the Rule violates express provisions of the Magnuson-Stevens Act. The Court therefore GRANTS Petitioners' Motion for Summary Judgment.[1] The emergency rule is hereby found invalid and is set aside.

## I. Statutory Framework:

In 1976, Congress passed the Magnuson-Stevens Act for the purpose, among others, of helping "conserve and manage the fishery resources" of the nation. 16 U.S.C. § 1801 (b)(1). The statute was most recently amended as the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, codified at 16 U.S.C. §§ 1801–1884 (Pub. L. No. 109–479, 120 Stat. 3575). The Act established eight Regional Fishery Management Councils, tasked with preparing Fishery Management Plans, or FMP, to address conservation and management of the fisheries under their control. 16 U.S.C. 1852(h)(1). One such Council, the

---

[1] The Court herein refers to the parties in various ways. The plaintiffs are also referred to as the "States" or as the "Petitioners." The defendants are also referred to as the "Respondents" and as the "federal defendants" and sometimes by individual names. The choice of wordage in this opinion is solely a matter of ease of reference and is not meant to necessarily refer to any one group or individual in a substantive fashion. The Court also recognizes that there can be fisherwomen as well as fishermen but has used the latter for ease of reference.

Gulf Council, consists of the States of Texas, Louisiana, Mississippi, Alabama, and Florida.  It, through the Secretary of Commerce, has authority over the fisheries in the Gulf of Mexico. *Id.* at (a)(1)(E).  The Statute requires Regional Fishery Management Councils to reach their fishery management plans through a process known as notice-and-comment rulemaking, a well-established cooperative framework through which the public and those affected by changes in a fishery management plan have an opportunity to be apprised of new rulemaking, and give their comments. *Id.* at § 1854(b).  Those Fishery Management Plans, if adopted by the Department of Commerce, are then promulgated by the Secretary of Commerce.

The Magnuson-Stevens Act § 305(c) provides for a special shortcut to this normally required notice-and-comment framework if "an emergency or overfishing" exists. *Id.* at 1855(c). The law provides that:

> [i]f a Council finds that an emergency or overfishing exists or that interim measures are needed to reduce overfishing for any fishery within its jurisdiction, whether or not a fishery management plan exists for such fishery . . . the Secretary may promulgate emergency or overfishing regulations . . . if the Council, by less than a unanimous vote, requests the taking of such action.

*Id.* at (2), (2)(B).  The statute does not specifically define, however, what kind of situation constitutes an "emergency."

Rather, the term is defined in the Policy Guidelines for the Use of Emergency Rules, certain guidelines issued by the NMFS, a federal agency which is part of the National Oceanic and Atmospheric Administration, itself an agency in the Department of Commerce.  These guidelines, or directives, were issued for the express purpose of determining "whether the use of an emergency rule is justified under the authority of the Magnuson-Stevens Fishery Conservation and Management Act." 62 Fed. Reg. 44421 (Aug. 21, 1997).  Originally termed "guidance," the

3

rules were officially made directives of the NMFS on March 31, 2008.[2]  In addition to specific criteria stating when an emergency exists, the directives make clear that acting under the Magnuson-Stevens Act's emergency provisions should only be reserved for extraordinary circumstances.  For example, the directives state:

> The preparation or approval of management actions under the emergency provisions of section 305(c) of the Magnuson-Stevens Act should be limited to extremely urgent, special circumstances where substantial harm to or disruption of the resource, fishery, or community would be caused in the time it would take to follow standard rulemaking procedures.  *An emergency action may not be based on administrative inaction to solve a long-recognized problem.* . . . The process of implementing emergency regulations limits substantially the public participation in rulemaking that Congress intended under the Magnuson-Stevens Act and the Administrative Procedure Act.  *The Councils and the Secretary must, whenever possible, afford the full scope of public participation in rulemaking.*

(*Id.*, emphasis added.)  The directives then go on to state that:

> For the purposes of section 305(c) of the Magnuson-Stevens Act, the phrase "an emergency exists involving any fishery" is defined as a situation that:
>
> (1) Results from recent, unforeseen events or recently discovered circumstances; and
> (2) Presents serious conservation or management problems in the fishery; and
> (3) Can be addressed through emergency regulations for which the immediate benefits outweigh the value of advance notice, public comment, and deliberative consideration of the impacts on participants to the same extent as would be expected under the normal rulemaking process.

*Id.*  The conjunction "and," which joins each criterion, makes it clear that each of the three criteria must be met in order for an emergency to exist.  Action taken when any one of the above criteria is not met is unjustifiable.

---

[2] *See* National Marine Fisheries Service Instruction 01-101-07, available at http://www.nmfs.noaa.gov/op/pds/documents/01/101/01-101-07.pdf (last visited May 17, 2013).

## II. Standard of Review:

According to the Magnuson-Stevens Act, regulations promulgated by the Secretary of Commerce under the Act "shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of title 5 . . . except that the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of such title." 16 U.S.C. § 1855(f)(1).  That chapter, part of the Administrative Procedure Act, states in relevant part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]
> (D) without observance of procedure required by law . . .

5 U.S.C. § 706.  The Fifth Circuit has formulated a test in much the same language, holding courts should only overturn agency rulings under the APA "if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Buffalo Marine Services, Inc. v. U.S.*, 663 F. 3d 750, 753 (5th Cir. 2011), quoting *Texas Clinical Labs, Inc. v. Sebelius*, 612 F. 3d 771, 775 (5th Cir. 2010).

With this standard in mind, this Court is also mindful that courts should conduct the process of judicial review according to a two-step inquiry laid out in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  Under the first step of the *Chevron* inquiry, a court must determine "whether Congress has directly spoken to the precise

5

question at issue." *Id.* at 842. If Congress's intent is clear, then the court must give effect to the

expressed intent of Congress, and the inquiry is over. *Id.* at 842–43. If the court determines that

Congress has not directly addressed the precise question at issue, however, the second step

comes into play. In that circumstance,

> the court does not simply impose its own construction on the statute, as would be
> necessary in the absence of an administrative interpretation. Rather, if the statute is silent
> or ambiguous with respect to the specific issue, the question for the court is whether the
> agency's answer is based on a permissible construction of the statute.

*Id.* at 843 (citations omitted). The *Chevron* Court goes on to say that, "[t]he power of an

administrative agency to administer a congressionally created . . . program necessarily requires

the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by

Congress." *Id.*, *citing Morton* v. *Ruiz,* 415 U. S. 199, 231 (1974). "If Congress has explicitly left

a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a

specific provision of the statute by regulation. Such legislative regulations are given controlling

weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–844.

The NMFS emergency criteria are therefore given controlling weight, since the term

"emergency" is not defined under the Magnuson-Stevens Act, but is defined under the NMFS

directives. The Emergency Rule itself also acknowledges that it must meet the emergency

criteria, despite its ultimate failure to do so on each of the three required counts. 78 Fed. Reg. at

17883.


## III. Factual Background and Events Leading Up to the Emergency Rule:

Red snapper is a reef fish found in the Gulf of Mexico, and is one of the species regulated

and managed by the Gulf Council in accordance with the Magnuson-Stevens Act. The fish is

6

found both in state waters, the area between the shore and between three to twelve nautical miles to sea, depending on the state, and federally managed waters, the area past state territorial waters and extending 200 nautical miles to sea. The federally managed zone is called the exclusive economic zone, or EEZ. Inside the EEZ, the red snapper fishery is regulated pursuant to the Fish Management Plan ("FMP") developed by the Gulf Council and approved and promulgated by the Secretary of Commerce pursuant to the Magnuson-Stevens Act.

Before the year 1997, the recreational fishing season was open yearround in the EEZ.[3] After that, NMFS instituted an in-season monitoring and closure process, shortening the season by smaller increments year by year. From the year 2000 through 2007, the season remained open for 194 days. In 2008, a revised rebuilding plan was adopted, and the number of days the season was open fell dramatically, to between 77 days in 2010 and 46 days in 2012. At the same time, the Council requested the five Gulf states to mirror the regulations in their state waters to those in the EEZ. The Magnuson-Stevens Act, however, provides that a state may set its own fishing season in state water. Texas chose to continue its yearround season. In 2008 Florida and Alabama both decided to implement more permissive seasons than had been requested by NMFS. After 2008, all Gulf states matched the EEZ, with the exception of Texas, whose yearlong state season has never changed. *Id.* at 3.

In 2012, however, Louisiana discussed extending its state season to be longer than the federal season. The Louisiana Wildlife and Fisheries Commission, tasked with setting the red snapper fishing season in state waters, decided to publish an official notice of intent to that effect

---

[3] Emergency Action Statement. Nat'l Marine Fisheries Serv., *Establish Recreational Closure Authority Specific to Federal Waters off Individual States for the Red Snapper Component of the Gulf of Mexico Reef Fishery*, 2 (Feb. 25, 2013).

at its May 3, 2012, meeting.[4]  Furthermore, Respondent Crabtree was present, and even spoke, at that very meeting.[5]

Several later meetings show that the Gulf Council had repeated notice of Louisiana's intentions.  Just a month later, the Gulf Council's Reef Fish Committee was already discussing Louisiana's notice of intent at its meeting.[6]  Respondents have suggested, not without some basis, that this original position was an attempt by Louisiana to force the Council to adopt regional management.  This may be true, but it also clear that it knew regional management was not going to be adopted in time to thwart Louisiana's stated purpose.  By August, Respondent Crabtree stated at the Gulf Council's meeting that the federal season would need to be shortened to account for Louisiana's soon to be and Texas's historical longer seasons and higher bag limits.[7]  The next day, Crabtree stated "it seems to me that right now Louisiana is not compliant."[8]  Later, at the Reef Fish Management Council's October meeting, Crabtree is quoted saying, "Louisiana has a season on the books now that is not consistent with the federal season for next year."[9]  He goes on to say "I think at the next full Council meeting in February is going to be a time when we're going to have to make some decisions about things."[10]  Thus NMFS through Crabtree purposefully postponed taking action over a known problem—this time for four months.  Against this context, Respondents' argument that Louisiana's decision to implement an extended season was a "recently discovered circumstance" rings hollow.

---

[4] Minutes, Louisiana Wildlife and Fisheries Commission Meeting, 9 (May 3, 2012).
[5] *Id.* at 5.
[6] Minutes, Reef Fish Management Committee, 5 (June 19, 2012).
[7] Minutes, Gulf Council Meeting, 21 (Aug. 21, 2012).
[8] *Id.* at 149.
[9] Minutes, Reef Fish Management Committee, 85 (Oct. 30, 2012).
[10] *Id.*

8

From time to time, the FMP is amended.  One such change, called Amendment 30(b) in minutes of various Gulf Council meetings, was originally proposed as an emergency rule at the April 2008 Gulf Council meeting.  The rule was not adopted under the emergency framework, but did become promulgated thereafter through normal rulemaking procedures. 50 C.F.R. § 622.4(a)(1)(iv) (1996).  According to the Amendment, charter vessels and headboats with federal for-hire reef fish permits must comply with the more restrictive federal regulations, regardless of whether the fish are caught in state controlled waters or the federally controlled EEZ. 50 C.F.R. § 622.4(a)(1)(iv) (1996).  This has a very real practical effect for anglers fishing for red snapper.  Since according to the parties most red snapper is found in federal waters, these fishermen are federally licensed.  Since they are federally licensed, under Rule 30(b), they can only fish on the federally sanctioned fishing days, even if they are fishing in state waters.  Thus, the number of federally approved fishing days is of critical importance.

As a practical matter, therefore, the FMP completely controls when such anglers may fish in any water.  The minutes of the Gulf Council's January 2013 meeting reveal that Respondent Crabtree, Regional Administrator of the NMFS and point person of the Gulf Council, stated that Rule 30(b) was instituted to account for state fishing seasons that were longer than the season in the EEZ.  Rule 30(b), unlike the rule in question here, applies across the board to all Gulf fishermen.  In Council meetings, Crabtree routinely describes states with longer fishing seasons as "noncompliant," despite the fact that the Magnuson-Stevens Act provides for a cooperative framework in which states retain the authority to regulate the fishing seasons off their individual coasts, while the NMFS regulates the season farther out to sea.

9

At the Gulf Council's February 2013 meeting, an emergency rule was proposed to address the issue of "noncompliant" state seasons—that is, seasons which were longer or otherwise more permissive than the federal season in the EEZ. The proposal to act under the Magnuson-Stevens Act's emergency provisions was narrowly voted down, but then after a break, the matter was taken up again.[11] The second time, the motion to act under emergency rules secured enough votes to narrowly pass.[12] On February 25, 2013, the Southeast Regional Office of NMFS produced an Emergency Action Statement, which was then officially promulgated by the Secretary of Commerce. By March 25, the Emergency Rule was published in the Federal Register. 78 Fed. Reg. 17882 (March 25, 2013). This is the actual rule under consideration here.[13]

The Emergency Rule states that it was instituted "to constrain recreational red snapper harvest within the quota while ensuring a fair and equitable distribution of fishing privileges among participants in all the Gulf states." *Id.* The Rule acknowledges the three NMFS criteria required to be met for emergency measures, and gives its reasoning for why it believes each one is met. *Id.* Each of those reasons, however, is flawed and each falls short of the standards required by the criteria for an emergency. The Rule then states "[t]hrough this emergency rule, if a Gulf state sets red snapper regulations that are inconsistent with Federal regulations, NMFS would calculate the recreational red snapper fishing season in the EEZ off that state using an adjusted catch rate . . ." *Id.* at 17882–83. The season starts on June 1st. The Rule goes on to tentatively set the closure dates for each state as follows: "Texas, June 12, 2013; Louisiana, June

---

[11] Minutes, Gulf Council Meeting, 189 (February 7–8, 2013).
[12] *Id.* at 166, 189, 195, 204.
[13] The Court notes that it excluded from the record over the objection of the states that subsequent to its adoption, the same Council voted to have this Rule withdrawn on an emergency basis.

9, 2013; Mississippi, June 28, 2013; Alabama, June 28, 2013; and Florida, June 21, 2013." *Id.* at 17883. Thus, anglers in Louisiana get only nine (9) days while right next door in Mississippi anglers get twenty-eight (28) days. This is the first time that anglers from the various states in the Gulf would be forced to have fishing seasons in the EEZ of different lengths.[14]

### IV. Analysis:

The NMFS directives state emergency action must be limited to extremely urgent and special circumstances, where substantial harm and disruption would be occasioned on a fishery in the time it would take to follow normal rule-making procedures. 62 Fed. Reg. 44421. The directives are clear that acting under the Magnuson-Stevens Act's emergency provisions cannot be pursued lightly, and certainly may not result from a Council's inaction in the face of foreseen problems. *Id.* Thus, this Court is asked to review the Emergency Rule using the NMFS directives. At the same time, this Court may not overturn the Emergency Rule unless it finds that the rule meets one of the requirements laid out in 5 U.S.C. § 706(1)(2)(A–D). Carefully balancing these competing interests, the Court now considers whether each emergency criterion was met in turn.

### Criterion 1:  Recent Unforeseen Events or Recently Discovered Circumstances

To establish the first criterion, the federal defendants relied upon the fact that Louisiana and Florida joined Texas in exercising the right to set their own fishing season in their respective state waters. The record contains very little information about Florida so this Court will accept Respondent's representations concerning Florida as being accurate.

---

[14] At oral argument it was suggested that these dates had been altered, but all agree the discrepancy against Texas, Louisiana, and Florida still exists. Again, the exact evidence about these dates was excluded pursuant to objections lodged by the federal defendants.

11

Nevertheless, this evidence does not support NMFS's conclusion about an unforeseen or recently discovered circumstance. The fact that states might set their own rules is a circumstance that is well known. First of all, it is provided for in the very act that set up the entire regulatory scheme. Secondly, it is not contested that Texas has set its own season since 1997. Third, in 2008, Texas, Alabama and Florida all set their own seasons—the latter two being by far the most productive states for catching red snapper.

Finally, it was known to the federal defendants for months that Louisiana was going to a different schedule. On May 3, 2012, the Louisiana Wildlife and Fisheries Commission, which sets the fishing season in state waters, voted to publish a notice of intent to extend the red snapper fishing season length and bag limit.[15] Respondents' argument that Louisiana's decision to extend its season was unforeseen or recently discovered is especially weak considering Respondent Crabtree was present, and even spoke, at that very meeting.[16]

Louisiana's extended 2013 season was raised again at the Gulf Council's Reef Fish Committee Meeting, held on June 19, 2012. The minutes from that meeting reflect Louisiana's decision from May 3, stating, "Randy and the Secretary and, of course, Roy [Crabtree] came down and made a presentation and they moved the regulations over into 2013 *and so the season in Louisiana territorial waters right now is set for the Saturday before Palm Sunday and it runs through September. . . .*" Minutes, Gulf Council Reef Management Committee Meeting, 5 (June 19, 2012) (emphasis added). This evidence shows that Louisiana's decision to extend its season was anything but a recently discovered circumstance. A full nine months before voting to act under the Magnuson-Stevens Act's emergency provision, the Council had notice that Louisiana

---

[15] Minutes, Louisiana Wildlife and Fisheries Commission Meeting, 9 (May 3, 2012).
[16] *Id.* at 5.

12

intended to extend its season in state waters. The fact that this possibility was described as already in motion is further proof of the same.

Similar statements were made in subsequent Gulf Council meetings. For example, at the Council's August meeting, Respondent Crabtree is quoted as saying "it seems to me that right now Louisiana is not compliant. They have a rule that has set a season to fish weekends with a three fish bag limit. Now, they may change that, but that's the rule on the books." Minutes, Gulf Council Meeting, 149 (August 22, 2012). Such a statement is further proof that the Council already viewed Louisiana's extension of its season as more likely than not. It was discussed further at the Council's October meeting, where Crabtree again stated, "Louisiana has a season on the books now that is not consistent with the federal season for next year."[17]

In response to this evidence presented by Petitioners, Respondents argue that "Florida and Louisiana announced their decisions to implement inconsistent regulations on February 13 and 20, 2013, respectively. This constitutes a 'recently discovered circumstance' under NMFS' Policy Guidance." (Resp'ts' Mot. Summ. J., 20). Respondents implicitly acknowledge that they had advance notice of those intentions, yet argue that the actual implementation of those intentions was recently discovered.

In support of this argument, Respondents cite one case, *Trawler Diane Marie, Inc. v. Brown*. In *Trawler*, the Plaintiff fishing vessel operator sued after the emergency closure of the scallop fishery off the coast of Alaska. The plaintiff had already harvested more scallops than the entire quota allotted for that season, and was able to continue taking in more than that amount every week. Furthermore, the vessel was completely unregulated. At that time, Alaska was able to regulate all fishing in both state waters and the EEZ off its coast because all fishing vessels

---

[17] Minutes, Reef Fish Management Committee, 85 (Oct. 30, 2012).

were registered with the state. The Plaintiff's vessel was not registered with the state, and therefore fell outside the jurisdiction of the state regulations, and was able to fish freely. The emergency rule was instituted to prevent runaway fishing from a vessel that the state's existing fishery plan has not contemplated.

In contrast to *Trawler*, there is no new player or game-changing factor in the present case. The issue of inconsistent state fishing season is not a new one to the Gulf Council, nor was Louisiana's specific decision to extend its state fishing season, as the evidence clearly shows. According to the evidence provided by the State of Texas, NMFS had over twice the time necessary to follow the notice and comment procedure from the time of Louisiana's announcement and it chose not to do so. It certainly had time to follow the notice and comment procedure following its June and August meetings where the problem was discussed in detail and in which Crabtree opined that they were not "in compliance."

**Criterion 2:** **Serious Conservation of Management Problems in the Fishery**

The federal defendants do not make the claim nor could they that this Emergency Rule was passed because of a serious conservation emergency. The reasons are discussed in detail in the latter part of this opinion and need not be repeated here. The claimed need was that inconsistent regulations resulted in an equitable allocation of fishery opportunities and economic benefits.

Even if this Court accepts that this is a management problem at all, this was certainly not an emergent discovery. Texas had, in the words of the defendants, not been "in compliance" since 1997. Thus, if the existence of different state rules constituted an emergency, this should have been addressed over a decade ago. Bureaucratic inertia or recalcitrance is not a reason that

14

some item becomes an emergency—just because the bureaucratic body finally finds itself "in motion" instead of "at rest." Further, in 2008 all sides concede that Alabama, Texas, and Florida were all "not in compliance" yet the NFMS did not act. Certainly those same inequities existed then, only more so since Alabama and Florida provided for the vast majority of the red snapper caught.

Finally, the inconsistent rules apply only to state waters and those fish caught by anglers who are not federally licensed (being that federally licensed fishermen must comply with the federal time periods). Dr. Crabtree has admitted that only 1–2% of the snapper caught in Louisiana come from state water. The same was conceded to be true as to Mississippi and Alabama by the intervenor at oral argument. All concede that regardless of the state, the better fishing exists in the EEZ. That being the case, the suggestion that a larger state fishing season is an emergency in 2013 when it never has been before is somewhat ludicrous.

In support of its argument that the reasons underlying the Emergency Rule fulfill this requirement, Respondents cite *Starbound, LLC v. Gutierrez*, 2008 WL 1752219 (W.D. Wash., Apr. 15, 2008). In that case, the Pacific Fishery Management Council adopted an emergency rule as a "stop-gag measure" to prevent a derby-style race for fish during the 2007 season. *Id.* at 2. Before the emergency measure, all the participants of a certain sector of the fishery were members of a private business arrangement known as the Pacific Whiting Conservation Cooperative, or PWCC. *Id.* By coordinating their efforts and voluntarily agreeing how to divide the sector allocation, the organization had been able to achieve stability in their sector of the fishery. *Id.*

Leading up to the 2007 season, that stability was threatened by changing circumstances, which the Court recognized as "a confluence of market and regulatory factors" which "provided added incentives to participate in the fishery." *Id.* at 5. The Court did not discuss these factors at length, except to say that the cooperative framework of the PWCC was threatened by new players entering the fishery. This breakdown threatened to change the formerly stable dynamic into a paradigmatic "tragedy of the commons," in which "individual fishing interests have an incentive to aggressively fish early in the season," and as a result "they reach bycatch limits early and the whole Fishery closes prematurely." *Id.* In order to prevent the breakdown of the cooperative system in place, the Court upheld the emergency measure, which prevented new vessels from entering the sector. *Id.* The measure was only meant as a temporary one, until more permanent rules could be adopted for the next year's season. *Id.* at 2.

Respondents argue this case provides support for the Gulf Council's Emergency Rule because in that case, just as in this one, NMFS responded to a "serious threat to conservation interests" (Resp'ts' Mot. Summ. J., 26, *citing id.*, 8). The two cases are not analogous, however. In *Starbound*, the Pacific Council was faced with a sudden influx of new fishing vessels which threatened to dismantle the privately established cooperative, stable framework into a tragedy of the commons race for fish. *Starbound* at 6.

Here, Respondents do not even suggest that differing state fishing seasons would result in a similar situation in which the different Gulf states race for fish. They, in fact, have said that the amount of fish caught will be the same. Instead, Respondents argue in their Motion that "inconsistent state regulations result in an inequitable allocation of fishing opportunities and economic benefits. . . ." The alleged emergency which would result would be "a transfer of

benefits from angers who fish in the EEZ to anglers who fish in state waters under less restrictive regulations" (Resp'ts' Mot. Summ. J., 23).  This policy argument does not qualify as a "serious conservation or management problem," as required by NMFS directives.  Furthermore, the Rule merely effectuates its own inequitable transfer in the opposite direction, and consequently would require another Emergency Rule to cure the effects of the Emergency Rule.

**Criterion 3:   Emergency Measures Outweigh the Value of the Normal Rule Making Process**

        The third and last criterion that must be met for an emergency to exist under NMFS directives is that the immediate benefits of emergency regulations must "outweigh the value of advance notice, public comment, and deliberative consideration of the impacts on participants to the same extent as would be expected under the normal rulemaking process."  62 Fed. Reg. 44421.  Respondents argue this condition is met because "delaying the announcement of this emergency rule to accommodate prior public notice and comment would result in significantly less advance notice of the EEZ closure dates off each Gulf state."  (Resp'ts' Mot. Summ. J., 26).  Stated differently, their argument is:  the Emergency Rule is needed so that people know about the Emergency Rule.  The flaw in this reasoning is two-fold.  First, it could apply in literally any situation where the Council wanted to take some action quickly and dispense with the normal procedural safeguards of the opportunity for notice and comment.  Notice of some agency action is always more preferable the earlier it comes, but such an interpretation of the third emergency criteria would render the rule useless or, at best, a tautology.

        Second, the argument is circular, because it assumes that the closure would have happened just as outlined in the Emergency Rule even if the usual notice-and-comment

procedures had been followed. In other words, Respondents argue that the benefits of emergency action are greater because it gives more notice of emergency action.

No one can argue that if the federal defendants had wanted to give anglers notice, the best course of action would have been to have gone through the normal notice-and-comment procedure. The federal defendants had ample time to do this, had they acted when Louisiana announced it was joining Texas in being "non-compliant." The Gulf Council had meeting after meeting where the topic was discussed, yet they chose to do nothing. Then, at the last moment possible they rushed through a rule, and used the fact that they were rushing through a rule as an excuse to rush through the rule.

This is totally unacceptable. It makes a mockery of the third criteria. Every rule no matter how mundane would qualify as an emergency as long as the criteria were to get notice out as soon as possible. There is no value in that. If the federal defendants had really cared about the fishermen they were about to discriminate against, they would have gone through the normal rule making procedure.

The record does not support the existence of an emergency under any of the three criteria. At best, it suggests bureaucratic inaction. Perhaps NFMS should have done something earlier, perhaps not. Regardless, a failure to act sooner than later does not qualify as an emergency, especially when one is enacting a policy which it knows will directly harm a segment of the population.

**V.    The Emergency Rule Violates the Statutory Prohibition Against Discrimination**

Title 16 U.S.C. § 1851(a)(4)(A) directs (in pertinent part):

(4)    Conservation and management measures *shall not discriminate between residents of different states.* If it becomes necessary to allocate or assign

fishing privileges among various United States fishermen, such allocation shall be

(A)   fair and equitable to all such fishermen

(Emphasis added.)  This Congressional mandate has been implemented in Sec. 600.325 also known as "National Standard 4—Allocation."  50 C.F.R. 600.325.  In pertinent part, that regulation requires that:

(a)   <u>Standard 4</u>.  Conservation and management measures *shall not discriminate between residents of different states*.  If it becomes necessary to allocate or assign fishing privileges among various U.S. fishermen, such allocation shall be:

(1)   *Fair and equitable to all such fishermen.*
(2)   Reasonably calculated to promote conservation.
(3)   Carried out in such manner that no particular individual, corporation, or other entity acquires *an excessive share of such privileges.*

(b)   *Discrimination among residents of different states.*  An FMP (Fish Management Plan) *may not differentiate among U.S. citizens, nationals, resident aliens, or corporations on the basis of their state of residence.*  An FMP may not incorporate or rely on a state statute or regulation that discriminates against residents of another state.

Sec. 600.325 National Standard 4—Allocations (in pertinent part; emphasis added).

Respondents do not argue that their action by taking away fishing days from Texas, Louisiana, and Florida and giving them to fishermen in Mississippi and Alabama is not an allocation.  Neither can they argue that it was done for conservation reasons, because the total catch remains the same.  Throughout the record, NMFS maintains:

"The action [Emergency Rule] would potentially change the distribution of fishing activity, but not the total catch allowed."

19

(Finding Of No Significant Impact ("FONSI")—Response 1)

>However, the total allowable red snapper recreational harvest would not be affected.

(FONSI No. 7.)

>The allowable harvest now and in the future will be in accordance with that rebuilding plan.

(FONSI No. 16.)

Thus, the Emergency Rule does not change the total catch allowed.  It does not enhance the conservation of red snapper in any way.[18]  All it does is to redistribute the right to fish from Texas, Louisiana, and Florida fishermen to the anglers of Mississippi and Alabama.  Further evidence of this is found throughout the supporting documentation.

>Anglers who fish in the exclusive economic zone ("EEZ") off states with consistent regulations (Mississippi and Alabama) would be (and actually have been allocated) expected to have longer open seasons, and receive the associated economic benefits.  Anglers in states with less restrictive regulations (Texas, Florida and Louisiana) . . . would not be allowed the full flexibility and associated benefits . . . as states with consistent regulations (Alabama and Mississippi).  FONSI No. 7.

>Thus, under both alternatives, some entities gain (Alabama and Mississippi fishermen) and other lose (Texas, Louisiana and Florida fishermen) benefits.

2013 Red Snapper Rule Chapter 3, p. 8.

>. . . those fishermen fishing in waters off states that do not have consistent regulations would experience a shorter federal season. . . .  The result would be a

---

[18] In other areas of the record, NFMS states that over fishing is not currently occurring—so that cannot be a reason for this Emergency Rule.  2013 Red Snapper Emergency Rule Chapter 1, p. 3.  Throughout the record, it maintains that the rebuilding of the red snapper population is successful and on target.

greater negative cumulative impact either from less time fishing or the cost to travel to other areas.[19]

*Id.* at 13.

None of Petitioners suggests, especially based upon this record, that NMFS is not interested in the overall goal of restoring the red snapper population. Certainly, the ultimate goal of controlling overfishing may contribute to that restoration. Nevertheless, as can be seen, this Emergency Rule does not contribute to that goal. All it does is shift the fishing rights from the anglers of Texas, Louisiana, and Florida to Mississippi and Alabama. Every reported case that has allowed the disparate treatment between citizens of states has done so because the rule or regulation in question was calculated to conserve the species in question. This rule does not.[20]

Both in their briefing and in oral argument before this Court, Respondents concede that under this Emergency Rule it was treating the fishermen in Texas, Louisiana, and Florida unequally. NFMS argued, however, that it was doing so to remedy a perceived inequality caused by the fact that the states of Alabama and Mississippi had chosen to set their state fishing season to match the EEZ season. Of course, there is nothing in either the statute or regulations promulgated to implement the Magnuson-Stevens Act that provides that the NMFS can discriminate against one group of fishermen unfairly in order to help another group.[21] To the contrary, such actions are directly prohibited.

---

[19] Later NFMS concedes that, given the costs involved, fishermen from Petitioners' states could not realistically go to other areas. Thus, they would just be put out of business.

[20] The only conservation argument that one could make in support of this rule is that by punishing the citizens of states with longer state fishing seasons that will eventually force those states to shorten their season, thus eventually and arguably conserving red snapper. The punishment of a state for exercising the very rights given to it by Congress is, at best, inappropriate, and discriminating against that state's citizens is obviously strictly prohibited.

[21] The statute also forbids NMFS from carrying out its mission in a manner calculated to favor a particular individual or group. 16 U.S.C. § 1851(a)(4)(C). This Emergency Rule violates this provision as well. It takes

The only rationale, regardless as how one characterizes the underlying motive, behind the Emergency Rule is that NMFS is going to penalize the anglers living in states that enact fishing seasons that do not match the federal season and reward those that do.  The NMFS (and the Secretary of Commerce) should not be in the business of penalizing states, and their citizens, merely because they exercised the very rights bestowed upon them by Congress.  16 U.S.C. § 1856.  Mississippi and Alabama are not without remedies to protect their own citizens if they feel their rights are jeopardized.  They can change their own fishing season to allow more days just as Texas, Louisiana, and Florida have.  (In fact, in 2008, Alabama had a season that did not match the federal one.)  Intervenor Alabama suggested in oral argument that, given the fact that they have limited offshore jurisdiction (three (3) miles as opposed to twelve (12) miles for Texas, nine (9) miles for Louisiana, nine (9)  miles for Florida), expanding their season will not effectively cure this perceived inequity.[22]  Obviously, they have the right to ask Congress to address this.  They also have the option to push for regional management—so that their more fertile fishing grounds are not managed in the same way as the less productive waters of Texas and Louisiana.

Any, all, or none of these alternatives may be pursued as the parties see fit.  What is not an alternative, and what is not sanctioned by any rule or regulation, is for NMFS out of its own sense of equity (and one that is certainly not universally held) to discriminate against the

---

fishing days from fishermen in Texas, Louisiana, and Florida and bestows them on those in Mississippi and Alabama.  It does this knowing that it will economically damage the fishermen in Texas, Louisiana, and Florida and bestow economic benefits on those in Alabama and Mississippi.

[22] While Alabama has a shorter season, one need only look to the fish landing statistics to see that their overall harvest is matched only by Florida and far exceeds that of Texas and Louisiana combined.  This may be due to a more favorable habitat, but it certainly does not suggest that Alabama needs extra fishing days in order to prosper.

residents of different states.  Robin Hood may have robbed the rich to give to the poor, but he, regardless of his motives, nevertheless broke the law when he did it.  Furthermore, if one looks at the actual poundage of red snapper caught (using the 2012 figures Respondents displayed at oral argument), and if one takes this admittedly weak literary reference one step further, when comparing at least Louisiana and Texas with Alabama, the NMFS is doing just the opposite—it is robbing from the poor to give to the rich.[23]

## VI.    Conclusion

As described above, this Court finds that the defendants did not observe the procedure required by law for implementing an emergency regulation.  Further, the Court finds that the Emergency Rule to be contrary to established law.  Not only does it violate the very wording of the Magnuson-Stevens Act, it also violates the spirit of federalism which is embodied in the act. The discriminatory actions taken by the Secretary of Commerce and the NMFS against the anglers of Texas, Louisiana, and Florida are contrary to the dictates of the act.  Further, the act envisions distinct areas of governance.  States are permitted by law to govern their own water; the federal government is to control the EEZ.  Both Petitioners and Respondents concede the only reason the Secretary adopted this rule was because these states insisted upon setting different dates in their own waters.  Thus, the actions of the NMFS, regardless of motivation, is the equivalent of telling states "if you do something we don't like, we will punish your citizens."

---

[23] This Court is not addressing the possible discriminatory factors raised by the record in that this Emergency Rule punishes fishermen in the only four counties and one parish in the entire Gulf Coast region that exceed both the minority and poverty thresholds set by the Government.  This was not raised by Petitioners and, therefore, not addressed by Respondents, and consequently this Court feels that it would be unfair to address this factor in any way in this decision.  The Court added this footnote to explain why it was not addressing this issue, despite the fact that it asked questions on this topic in oral argument and to suggest that if a similar rule is considered in the future that this situation at least be analyzed in detail before poverty level minorities are deprived of their fishing rights.

The fact that three states decided to go their own way may ultimately prove troublesome to the Department of Commerce. Certainly, a one-size fits all rule is easier to promulgate and regulate. Nevertheless, the passage of an Emergency Rule, without proper notice and comment, which discriminates against a dissenting state's citizens is not the appropriate or legal method to remedy the situation. The record has references to at least two different alternative means which if legally enacted might very well achieve NMFS's stated goals. There may be additional methods to accomplish these goals as well. Certainly, any time an agency is faced with the task of conservation, while an industry exists to capture the species being conserved, a certain amount of tension is bound to exist. In this instance, however, the record contains proof that the reclamation of the red snapper population is not only on target, but that with cooperation from states, industry, and the federal government, it is an achievable goal. That cooperation will certainly require some compromise on all sides and what form that precarious balance takes will be best achieved when the proper notice and comment procedure is followed. This will also insure that everyone gets a fair chance for input and hopefully will prevent a situation where certain groups of anglers are deprived of their rights.

Having decided then that the Emergency Rule was not enacted in compliance with the required criteria for emergency measures, and having found that the Rule also impermissibly discriminates against citizens of different states in violation of 16 U.S.C. § 1851(a)(4), this Court hereby **GRANTS** Petitioners' Motion for Summary Judgment as well as the Cross-Motion for Summary Judgment filed by the Charter Fisherman's Association. It also **DENIES** the Cross-Motion for Summary Judgment filed by the federal defendants. Under 16 U.S.C. § 1855(f), 5 U.S.C. § 706, and 28 U.S.C. § 2201, this Court hereby finds the Emergency Rule was not

promulgated in accordance with established law, is contrary to statutory provisions, and was adopted without observance of the procedure required by law, and therefore in violation of 5 U.S.C. § 706(2)(A), (B), and (D).  The Emergency Rule, 78 Fed. Reg. 17882, is therefore void and of no force and effect and shall not be enforced.

Signed this 31st day of May, 2013.

Andrew S. Hanen
United States District Judge